# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTIE PERRIN, | )<br>) |
| *Plaintiff*, | )<br>) Case No. 2:23-cv-464 |
| vs. | )<br>) |
| THE CROSSROADS FOUNDATION, | )<br>) |
| *Defendant*. | )<br>) **JURY TRIAL DEMANDED** |

## COMPLAINT IN CIVIL ACTION

Plaintiff, Christine Perrin (hereinafter, "Plaintiff"), by and through the undersigned counsel, now files the within Complaint in Civil Action against Defendant, The Crossroads Foundation, averring as follows:

## PARTIES

1. Plaintiff is an adult individual who resides at 439 Fielding Drive, Pittsburgh, Pennsylvania 15235.

2. Defendant, The Crossroads Foundation (hereinafter, "Defendant"), is a non-profit corporation formed under the laws of Pennsylvania and operates its business within the Commonwealth of Pennsylvania. Defendant's principal place of business is located at 6901 Lynn Way, Pittsburgh, Pennsylvania 15221.

**JURISDICTION AND VENUE**

3. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings this lawsuit asserting that Defendant violated the Civil Rights Act of 1866, 42 U.S.C. § 1981 (hereinafter, "Section 1981").

4. Venue is also proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to the claim asserted herein occurred in the city of Pittsburgh, Allegheny County, which is within the geographic confines of the United States District Court for the Western District of Pennsylvania.

**PROCEDURAL HISTORY AND FACTUAL ALLEGATIONS**

5. At all times relevant hereto, Plaintiff is an African American female.

6. On or about September 2018, Plaintiff was hired by Defendant in the role of "Academic Counselor". At the outset of Plaintiff's employment, Plaintiff was compensated on a salaried basis of $39,000.00 per annum.

7. At this time, and consistently throughout the tenure of Plaintiff's employment, Defendant employed approximately ten (10) to twelve (12) employees.

8. Plaintiff came into her role at Defendant's institution with several years of experience, wherein she had earned and enjoyed professional praise, accomplishments, and exemplary performance reviews. Given the number of years and experience she possessed in field, and her high-level performance of same, Plaintiff's starting salary, noted above, was well below her earning capacity or what she could reasonably expect as wages. Nonetheless, Plaintiff accepted Defendant's offer of employment based on the assumption that increased compensation would follow in natural and due course.

9.     Within her role as Academic Counselor, Plaintiff's primary job duties required her to assist students in making and developing academic and career plans while in their high school career.  This often included, but not was not limited to, helping students select courses to ensure that their chosen classes conformed with the recommended academic plan and the student's future academic goals; providing tools and resources to help the students with various challenges they encountered that could impact their ability to perform well academically; and advising students in topics such as extracurricular activities, volunteer opportunities, and leadership opportunities to bolster their academic transcript.

10.     At all times relevant herein, Esther Mellinger-Stief (hereinafter, "Ms. Stief") was an "Executive Director" within Defendant's organization and possessed supervisory authority over all of Defendant's employees, including Plaintiff.  Furthermore, Ms. Stief was imbued with the duties and responsibilities of a human resources manager.  At all times relevant hereto, Ms. Stief was a Caucasian female.

11.     Throughout the course of Ms. Steif's supervisory capacity over Plaintiff, Ms. Steif exhibited numerous racially charged and derogatory behaviors towards Plaintiff and Plaintiff's African American coworkers.  Further, Ms. Steif perpetuated this evident racially discriminatory animus upon the work environment and created various policies that negatively impacted the terms and conditions of Plaintiff and Plaintiff's similarly situated coworkers.

12.     For instance, at the explicit directive of Ms. Stief, all African Americans employed at Defendant's institution were strangely required to always keep their office doors ajar.  By stark contrast, Ms. Stief permitted similarly situated Caucasian employees to close their office doors. This clear disparity in behavior and treatment was noticed and remarked by Plaintiff and Plaintiff's coworkers.

13. Furthermore, Ms. Stief expressly, and in no uncertain terms, forbade all African Americans employed at Defendant's institution from engaging in "side-talks" or "small talks" amongst each other and were, instead, commanded to return to work. By contrast, Ms. Stief allowed similarly situated Caucasian employees to engage in conversations amongst themselves without chastisement or disciplinary scrutiny effectuated by Ms. Steif.

14. On or around August of 2020, Plaintiff's son suffered a traumatic, life-threatening medical event, which required numerous surgical procedures and an extended in-patient hospital stay.

15. On or about February of 2021, while Plaintiff's son was recovering from his third surgery, Plaintiff approached Ms. Stief and requested a leave of absence to tend to her son, seek personal therapy, and emotionally heal from the traumatic episode, mentioned above, and its devastating effects.

16. Ms. Stief denied Plaintiff's request for a leave of absence. Ms. Stief then threatened Plaintiff's employment and stated that in the event Plaintiff utilized any leave, Plaintiff's employment could be terminated immediately.

17. Upon information and belief, Ms. Stief approved leave of absences for similarly situated Caucasian workers who experienced life situations and events that, comparatively speaking, were much less dramatic than that endured by Plaintiff.

18. Ms. Stief then instructed Plaintiff that, if Plaintiff disagreed with Ms. Steif's decision, Plaintiff could submit correspondence to Defendant's Board of Directors (hereinafter, the "Board") and formally request a leave of absence.

19. Thereafter, Plaintiff provided the Board with a formal written request for thirty (30) days of leave time. On or about April of 2021, the Board approved Plaintiff's request for a 30-day

leave of absence after which she would return to the same position and salary at Defendant's institution.

20.  Although Plaintiff required more than thirty (30) days of leave time, Ms. Stief's threat to terminate Plaintiff's employment deterred Plaintiff from seeking or requesting more than thirty (30) days of leave in her correspondence to the Board.

21.  After her leave of absence expired, Plaintiff returned to work with Defendant in May of 2021 and assumed her previous role as Academic Counselor.

22.  In July or August 2021, Plaintiff verbally requested that Ms. Stief support her in an upcoming yearly performance evaluation in September 2021, which would mark Plaintiff's third year of employment with Defendant.  Ms. Stief denied the request.

23.  In the previous two years, and despite remarkable performance evaluations, Defendant had only increased Plaintiff's annual salary on a miniscule level - from $39,000.00 annually to $39,975.00 annually – or approximately $487.50 per year or less than $10.00 a week.

24.  Upon information and belief, during the same timeframe, similarly situated Caucasian employees who received performance evaluations comparable to that of Plaintiff received greater pay increases.

25.  Because Plaintiff was in her third year of employment with Defendant, Plaintiff was eligible to receive a relatively significant increase in her annual salary, depending on the results of her yearly performance evaluation.

26.  On or about August of 2021, Ms. Stief directed Mr. Fabian Cotton (hereinafter, "Mr. Cotton"), Plaintiff's immediate and direct supervisor, to instruct Plaintiff to conduct a self-evaluation as part of her annual performance review.

27. Plaintiff carried out the self-evaluation with accuracy and objective sincerity. However, immediately thereafter, Ms. Stief gained access to Plaintiff's self-evaluation through Mr. Fabian and proceeded to downgrade Plaintiff's overall scores.

28. Mr. Cotton then requested that Plaintiff sign the now revised self-evaluation, as it was significantly downgraded by Ms. Stief, to which Plaintiff declined to do so because the self-evaluation was no longer an accurate reflection of her work performance.

29. In downgrading Ms. Perrin's self-evaluation, Ms. Stief focused, bizarrely, on the fact that Ms. Perrin failed to meet with fifty students on her caseload during the school year.

30. However, during the relevant time, it was impossible for Ms. Perrin to accomplish this goal due it being the height of the COVID-19 Pandemic.

31. Ms. Perrin responded to Ms. Stief's downgrading of her self-evaluation with a written explanation, but Ms. Stief refused to amend the evaluation.

32. Although Plaintiff declined to sign the self-evaluation form, as downgraded, Ms. Stief nonetheless directed Plaintiff to sign it, stating, "Look at it this way, this is a chance for you to grow" and ultimately coerced Plaintiff into signing the evaluation form.

33. Ultimately, Plaintiff's self-evaluation had a negative effect on her subsequent, official performance evaluation and, while Plaintiff could have received a much greater raise, Defendant increased her salary by a mere 2%, to wit: $41,975.00.

34. Upon information and belief, contemporaneous with the above-delineated events, a Caucasian coworker who performed the same work functions as Plaintiff and had only been employed by Defendant for approximately one year, received an increase in her annual salary to $42,000.00.

35. Shortly thereafter, Ms. Stief leveled a fictitious accusation against Plaintiff, indicting her for having "side-talks" or "small talks" with an African American coworker, Gabriella Davis (hereinafter, "Ms. Davis").

36. In response, Plaintiff told Ms. Stief: "I am an adult, I'm tired of you treating me like a child, and I think you only target certain people. I think you have a problem with women of color." Ms. Stief did not respond and refused to institute any formal investigation into Plaintiff's report of the discriminatory conduct and environment to which Ms. Stief fostered.

37. Given the lack of action to cure the discriminatory work environment perpetuated by Ms. Stief, Plaintiff was ultimately left with no choice but to resign from her position or continue to be subjected to the racial discrimination effectuated by Ms. Stief. As such, Plaintiff resigned from her position with Defendant on September 7, 2021.

38. Subsequently, Defendant advertised for an Academic Counselor position, which stated that the lowest level salary for the position was $43,000.00 and the highest was $50,000.00, depending on experience.

39. Notably, the attrition rate for African American employees employed at Defendant's institution was significantly higher than that of their Caucasian counterparts. For example, upon information and belief, in the 2021 year to the date of this Complaint, five (5) African American employees quit, involuntarily resigned, or were terminated from their employment with Defendant.

40. Upon information and belief, the above-mentioned African American employees quit, involuntarily resigned, or were terminated as a result of the discriminatory practices perpetuated and effectuated by Defendant.

41.     Approximately eight months after Plaintiff resigned, on or around May of 2022, Plaintiff received an unsolicited e-mail message from Ms. Stief requesting that the two meet for lunch, breakfast, or coffee.

42.     In particular, Ms. Stief stated: "I would really like your [Plaintiff's] insights into some of the dynamics here at Crossroads [Defendant], particularly around [*sic*] race and how it plays out among staff, board and at the school. . . If you would be willing to revisit your time here at Crossroads [Defendant] and talk through your observations with me, let me know."

43.     Plaintiff responded with an e-mail declining Ms. Stief's invitation to meet and converse. Ms. Stief then replied via e-mail, stating, in pertinent part, as follows: "Thank you for taking the time to respond. My reasons for reaching out were that I wanted feedback from someone who was direct and honest . . . so that I could . . . make meaningful changes. . . ."

44.     Ms. Steif also stated in this e-mail that the "professionals" employed with Defendant "deserve to work in a supportive environment" and admitted that she had "fallen short during the last two years."

45.     Finally, in this e-mail Ms. Stief apologized to Plaintiff and commended her work performance while employed with Defendant: "You connected so well with the scholars and parents and made a real difference for your scholars every day. I am so very sorry if I made you feel anything less than a valuable member of the team."

46.     On or about January 3, 2023, Plaintiff received an email from Dr. Jessica Spradley, PhD, who represented: "… I am working with Crossroads to complete a review of the organization from a diversity lens. I know you are separated from the organization, however, I believe your experience is valuable and I would love to include your perspective. I would love to meet virtually

8

with you for 30 minutes. If you can give me 2-3 times this week that work for you I will do my best to be flexible and accommodate one of those times. I look forward to hearing from you soon."

## COUNT I
## RACIAL DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866
## 42 U.S.C. § 1981

47. Plaintiff incorporates the allegations contained in the paragraphs set forth above, as if fully set forth at length herein.

48. In relevant part, Section 1981 grants "[a]ll persons. . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

49. It is now well settled that Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts. See, e.g., *Johnson v. Railway Express Agency*, 421 U.S. 454, 459-460 (1975).

50. Further, Section 1981 clarifies that "the term 'make and enforce contracts' includes . . . the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

51. As averred above, Defendant has engaged in a pattern and practice of intentional racial discrimination with respect to the benefits, privileges, terms, and conditions of Plaintiff's employment contract with Defendant.

52. More specifically, Defendant permitted similarly situated Caucasian employees to close their office doors and allowed them to engage in "side-talks" or "small talks," but did not provide the same workplace privileges to Plaintiff, an African American.

53. Defendant, acting through Ms. Stief, also provided leaves of absences to similarly situated Caucasian workers in substantially similar circumstances to those endured by Plaintiff, but denied Plaintiff the workplace privilege of obtaining a leave of absence.

54. In addition, Defendant committed disparate treatment in not paying Plaintiff an amount of wages that was on par with - or comparable to - her similarly situated Caucasian coworkers.

55. But for Defendant's racially discriminatory practices, Plaintiff would have received the same benefits and privileges, discussed directly above, that Defendant bestowed to its Caucasian employees who were similarly situated to Plaintiff.

56. The intentional, racially discriminatory character of Defendant's actions is further buttressed by Ms. Stief's above-mentioned statements to Plaintiff in the e-mails following Plaintiff's resignation and the attrition rate of its African American employees.

57. As a result of the racially discriminatory practices that Defendant inflicted upon her, Plaintiff was forced to resign from her position as an Academic Counselor. Stated differently, Plaintiff is the victim of constructive discharge because any reasonable person in the shoes of Plaintiff would have resigned from employment.

58. In total, Defendant's actions against Plaintiff were undertaken with reckless and callous indifference to Plaintiff's federally protected right, as an African American, to enjoy the same benefits and privileges that Defendant granted its Caucasian employees.

59. As a result of Defendant's repeated acts and practices of racial discrimination, Plaintiff has suffered and continues to suffer damages, including but not limited to, lost wages, loss of reputation, lost career opportunities, and severe emotional distress and mental anguish.

WHEREFORE, Plaintiff hereby requests this Honorable Court consider the above and grant relief in her favor. Specifically, Plaintiff requests this Court award her compensatory damages, back pay, front pay, punitive damages, prejudgment and continuing interest, and reasonable attorney's fees and costs.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in her favor, and against Defendants and prays for relief as follows:

1. Declare and find that Defendant committed one or more of the following acts:
    i. Violated Section 1981 by engaging in a pattern and practice of intentional racial discrimination; and/or
    ii. Violated Section 1981 by committing disparate wage treatment on the basis of race.
2. Award compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life;
3. Award equitable relief in the form of back pay and front pay;
4. Award punitive damages sufficient to deter Defendant from future conduct;
5. Award attorney's fees; and/or
6. Award pre-judgment and continuing interest as calculated by the Court.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date: March 16, 2023

By: <u>*/s/ Erik M. Yurkovich*</u>
Erik M. Yurkovich (Pa. I.D. No. 83432)
Kyle H. Steenland (Pa. I.D. No. 327786)
The Workers' Rights Law Group, LLP
Foster Plaza 10
680 Andersen Drive, Suite 230
Pittsburgh, PA 15220
Telephone: 412.910.9592
Fax: 412.910.7510
erik@workersrightslawgroup.com
kyle@workersrightslawgroup.com

*Counsel for Plaintiff, Christie Perrin*

## **VERIFICATION**

    I, Christie Perrin, have read the foregoing allegations in the foregoing Complaint in Civil Action and verify that the statements therein are correct to the best of my personal knowledge, information and/or belief. I understand that this verification is made subject to the penalties of 18 Pa. C.S. 4904, relating to unsworn falsification to authorities, which provides that if I knowingly make false averments, I may be subject to criminal penalties.

Dated: March 16, 2023

*Christie Perrin*
Christie Perrin